258 P.3d 248

ESTATE OF Timothy MAUDSLEY; Patrick Maudsley and Keady Maudsley, husband and wife; and personal representatives of the Estate of Timothy Maudsley, Plaintiffs/Appellants,

v.

META SERVICES, INC., an Arizona corporation; ValueOptions, Inc., a business entity; Carlos Orestes Andarsio, M.D. and Jane Doe Andarsio, husband and wife; Bill G. Sbiliris, M.D. and Jane Doe Sbiliris, husband and wife, Defendants/Appellees.

No. 1 CA–CV 10–0494.

Court of Appeals of Arizona, Division 1, Department D.

June 23, 2011.

Law Offices of David J. Don, PLLC By David J. Don, Phoenix, Co–Counsel for Plaintiffs/Appellants.

Law Offices of Gregory C. Tishkoff, PLC By Gregory C. Tishkoff, Mesa, Co–Counsel for Plaintiffs/Appellants.

Udall, Shumway & Lyons, PLC By H. Micheal Wright and Lincoln M. Wright, Mesa, Co–Counsel for Plaintiffs/Appellants.

Renaud Cook Drury Mesaros, PA By Carol M. Romano, and Kevin R. Myer, Phoenix, Attorneys for Defendant/Appellee Meta Services, Inc.

Clark Hill PLC By Russell A. Kolsrud, Mark S. Sifferman and Duncan J. Stoutner,

Scottsdale, Attorneys for Defendants/Appellees ValueOptions, Inc., Carlos Orestes Andarsio, M.D., and Bill G. Sbiliris, M.D.

## OPINION

NORRIS, Judge.

¶ 1 This appeal arises from summary judgment dismissing negligence and wrongful death claims filed by the Estate of Timothy Maudsley against the operators of a psychiatric care facility, Meta Services, Inc. and ValueOptions, Inc., and two psychiatrists employed by ValueOptions, Carlos Andarsio, M.D., and Bill Sbiliris, M.D. The Estate argues the superior court should not have granted summary judgment to defendants because, contrary to its ruling, defendants owed a duty of reasonable care to Maudsley, who was mentally ill. We agree with the Estate. First, defendants owed Maudsley a duty of reasonable care based on public policy as reflected by Arizona statutes that authorize and, in some cases, require mental health screening, evaluation, and treatment of mentally ill individuals such as Maudsley. Second and alternatively, defendants owed a duty of reasonable care to Maudsley if he had a doctor-patient relationship with them. Because the parties presented conflicting evidence as to whether such a relationship existed, the court should not have granted summary judgment in defendants' favor on that issue. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 On April 26, 2005, at 1:03 p.m., a ValueOptions psychiatrist filed a Petition for Court–Ordered Evaluation with the superior court to require Maudsley, who was already a ValueOptions patient, to submit to inpatient psychiatric evaluation because of a mental disorder that rendered him "[p]ersistently or acutely disabled." The psychiatrist attached to the petition an Application for Involuntary Evaluation from Maudsley's mother. In the application, Maudsley's mother stated her son suffered from "impaired judgment, doesn't understand [the] importance of medication [and] treatment, [and] walked away from [a] residential treatment facility and psychiatric recovery center." The psychiatrist also attached a Pre–Petition Screening Report by Maudsley's ValueOptions case manager that stated, "Given Client[']s current behaviors and continued refusal to accept voluntary evaluation, and the continued increase in symptoms, it appears Court Ordered Evaluation may be necessary."

¶ 3 Twenty-one minutes after the psychiatrist filed the petition, Arizona State University police received a call about a suspicious person on the Tempe campus. An officer spoke with the person, who turned out to be Maudsley, who said he was mentally ill and would like some help. The officer noticed Maudsley had a swollen ankle and was having difficulty walking. Police called CARE 7, a crisis care organization, which sent C.J. to speak with Maudsley.

¶ 4 C.J. arrived and spoke with Maudsley, who told her he was a ValueOptions patient. C.J. called the ValueOptions Crisis Line and, according to her report written two days later, in which she refers to herself as "CARE 7," she was told to take Maudsley to the Psychiatric Recovery Center ("PRC").

> CARE 7 was told that [Maudsley's] parents were involved, along with Value Options, in a petition hearing that morning and that he would probably end up at Desert Vista. CARE 7 asked the Value Options case manager several times what needed to be communicated when Tim was taken to META. CARE 7 agreed to mention the petition hearing and the Value Options connection to the intake personnel at META. CARE 7 was told they would automatically call Value Options for information.

¶ 5 C.J. referred to PRC as "META" because PRC was "licensed and operated by" Meta. Under a contract between ValueOptions and Meta, the psychiatrists at PRC worked for ValueOptions, while the PRC support staff worked for Meta. The PRC medical director, Dr. Sbiliris, worked for ValueOptions and supervised the psychiatrists but did not supervise the support staff. At the time, ValueOptions was the Regional Behavioral Health Authority ("RBHA") for

Maricopa County and contracted with the State of Arizona to provide behavioral health services to certain qualified individuals in Maricopa County.

¶6 Consistent with what ValueOptions told her, C.J. transported Maudsley to PRC and told the receptionist and another employee that Maudsley was a ValueOptions patient with a pending petition for court-ordered evaluation. Because Maudsley did not want to write, C.J. "fill[ed] out the papers for admission." According to C.J., Maudsley "was being fully cooperative" and was "fine" with being at PRC. C.J. repeated to Dr. Andarsio[1] what she had told the receptionist and the other employee. According to C.J.'s written report, Dr. Andarsio

> met with CARE 7 and after hearing the information that Value Options relayed said the information was sufficient for intake. [Dr. Andarsio] signed the encounter sheet as the "Agency accepting client" and said CARE 7 was released. When CARE 7 left the premises Tim was standing outside the door to the waiting room and the intake personnel was aware of where he was because they were just inside the door and saw him walk out. CARE 7 reminded Tim that intake would be right with him and not to leave.

¶7 Dr. Andarsio spoke to Maudsley and asked him about his ankle injury, if he was "hearing any voices," "if he was thinking that people could read his thoughts," "whether he thought people put thoughts into his mind and take thoughts out of his mind," "if he was at risk of hurting himself," and "if he was at risk of hurting anybody else." After speaking with him, Dr. Andarsio "was impressed with" Maudsley's "disorganized thought process," which Dr. Andarsio equated to a "chronic psychotic condition." Dr. Andarsio asked Maudsley if he would go to the emergency room to have his ankle treated and then come back to PRC. Dr. Andarsio said Maudsley told him he would return. At Dr. Andarsio's "request," a Meta employee

pushed Maudsley in a wheelchair across the parking lot to Maricopa Medical Center, where the emergency room admitted him. Maudsley left the waiting room before being treated.

¶8 That night, a witness saw Maudsley "jumping up and down" and "causing a scene" near a Phoenix intersection. Maudsley attempted to cross the street against the stoplight and a car hit him. He sustained severe injuries and died ten months later from complications from those injuries.

¶9 After the Estate sued Meta, ValueOptions, Dr. Andarsio, and Dr. Sbiliris for negligence and wrongful death, the Estate deposed C.J. and Dr. Andarsio. Their testimony differed in significant respects. C.J. testified she told the receptionist, the other employee, and Dr. Andarsio that Maudsley was a ValueOptions patient with a petition for court-ordered evaluation. C.J. also testified that, based on Dr. Andarsio telling her he had "all the information that [he] need[ed]" and her prior encounters with PRC, she assumed Maudsley would be admitted to PRC. Dr. Andarsio, however, testified he was "not aware" Maudsley was a ValueOptions patient and was "not informed" a petition had been filed for Maudsley. Dr. Andarsio testified he knew only that Maudsley was "a voluntary patient." When asked whether he had assumed Maudsley was at PRC for a psychiatric evaluation, Dr. Andarsio said he did not "really know how to answer that question, other than the fact that he arrived at PRC and I asked him a series of questions."

¶10 Subsequently, the superior court granted summary judgment to Meta, ValueOptions, and Drs. Andarsio and Sbiliris, ruling they did not owe Maudsley a duty of reasonable care. The Estate timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).[2]

---

1. During her deposition, C.J. did not remember the name of the psychiatrist she spoke to, but this psychiatrist was referred to as "Dr. Andarsio" in the deposition and, in his deposition, Dr. Andarsio confirmed he was the psychiatrist involved in the encounter with C.J.

2. Although the Arizona Legislature amended certain statutes cited in this decision after Maudsley was injured, the revisions are immaterial. Thus, we cite to the current versions of these statutes.

## DISCUSSION

■ ¶ 11 The Estate argues the superior court should not have granted summary judgment to defendants because they owed Maudsley a duty of care based on statutes and the existence of a doctor-patient relationship.[3] We agree in part. First, defendants owed Maudsley a duty of reasonable care based on considerations of public policy as shown through Arizona statutes. Second, even if public policy as reflected by state statutes does not support recognition of a duty of care, a duty of care existed if Maudsley had a doctor-patient relationship with defendants. Because the parties presented conflicting evidence on whether such a relationship existed, a factfinder needed to decide this preliminary fact question. Thus, the superior court should not have granted summary judgment.[4]

### I. Preliminary Matters

¶ 12 First, although the superior court's ruling granting summary judgment mentioned breach, it was premised on the absence of duty. Viewed in context, the superior court's reference to breach appears incidental; indeed, the Estate and defendants have focused their appellate arguments on duty. Thus, in our view, duty is the only issue properly before us and the only issue we address.[5]

■ ¶ 13 Second, ValueOptions and Meta argue we should affirm summary judgment in their favor because the Estate failed to present evidence showing they had proximately caused Maudsley's death. We disagree. In an affidavit, the Estate's standard-of-care expert, Jack Potts, M.D., stated Maudsley's death was the "predictable result of several obvious failures of his mental health care providers," such as failing to log in all patients at PRC and failing to safely transfer patients for medical clearance. This affidavit sufficiently raised genuine issues of material fact as to proximate cause. *See Stearman v. Miranda*, 97 Ariz. 55, 59, 396 P.2d 622, 625 (1964) (generally, proximate cause is to be decided by the factfinder).

¶ 14 Third, the record contains little information about the relationship between Meta and ValueOptions. Indeed, in moving for summary judgment, neither Meta nor ValueOptions provided the court with any details regarding their relationship other than those recited above. *See supra* ¶ 5. Neither argued it could not be liable because it was subject to a different duty of care than the other, or to no duty of care because of their contractual relationship, or even that the other was responsible for Maudsley's care.[6] Dr. Sbiliris did, however, argue he could not be liable because he never interacted with Maudsley—an issue we consider separately. *See infra* ¶¶ 26–27. It is clear from the record that, regardless of the contractual relationship, ValueOptions and Meta operated PRC in tandem and PRC provided psychiatric services. As a result, and given the state of the record, we treat all defendants collectively in this decision.[7]

3. The Estate also argues defendants owed Maudsley a duty arising out of an undertaking to provide services to a non-patient. In light of our holding that defendants owed Maudsley a duty based on statutes, we do not consider this argument.

4. We review de novo the superior court's entry of summary judgment and view the evidence in the light most favorable to the Estate. *Brookover v. Roberts Enters., Inc.*, 215 Ariz. 52, 55, ¶ 8, 156 P.3d 1157, 1160 (App.2007). If an issue of material fact exists, summary judgment is not appropriate. *Orme Sch. v. Reeves*, 166 Ariz. 301, 309–10, 802 P.2d 1000, 1008–09 (1990). "Whether a legal duty exists is a question of law that we review de novo." *Clark v. New Magma Irrigation & Drainage Dist.*, 208 Ariz. 246, 248, ¶ 8, 92 P.3d 876, 878 (App.2004).

5. In their answering briefs on appeal, ValueOptions mentioned breach in a sentence and Meta did not mention breach at all. ValueOptions's passing reference to breach failed to preserve the issue on appeal. Additionally, the record reflects a triable issue of fact existed regarding whether Dr. Andarsio breached the standard of care in his questioning of Maudsley at PRC.

6. We note ValueOptions argued that insofar as the Estate's claims against it "pertain[ed] to policies," Meta had "drafted and issued the PRC policies" and thus ValueOptions could sustain no liability from such policies.

7. On remand, Meta and ValueOptions will be free to present to the superior court additional evidence and details about their relationship and to assert any defenses to the Estate's claims that arise out of that relationship or their different roles at PRC.

*II. Duty Based on Considerations of Public Policy*

¶ 15 "To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007). In *Gipson*, the Arizona Supreme Court held an employee who gave prescription drugs to a co-worker owed a duty of care to the co-worker—who later died from a drug overdose—based on public policy reflected by criminal statutes that prohibited the distribution of prescription drugs to those not covered by the prescription. *Id.* at 146, ¶ 26, 150 P.3d at 233. The court considered two possible bases for a duty: (1) the relationship between the parties and (2) public policy considerations. *Id.* at 144–46, ¶¶ 18–26, 150 P.3d at 231–33. The court expressly rejected foreseeability as a factor in determining duty. *Id.* at 144, ¶ 15, 150 P.3d at 231. Although duties of care can arise from special relationships, the court explained duty is a legal matter, not a factual one, and determinations of duty should not be based on a "fact-specific analysis" of the relationship between the parties. *Id.* at 145, ¶¶ 20–21, 150 P.3d at 232. Public policy may be found in state statutes and the common law. *Id.* at 146 n.4, ¶ 24, 150 P.3d at 233 n.4.

¶ 16 We consider the relationship between the parties subsequently, *see infra* ¶¶ 23–25, but first we consider whether public policy created a duty. In *Gipson*, the court analyzed criminal statutes to find a duty of care. 214 Ariz. at 146, ¶ 26, 150 P.3d at 233. Here, we analyze Arizona's mental health statutes to determine whether they provide a basis for a duty of care.

¶ 17 In 1974, the Arizona Legislature enacted the Mental Health Services Act. 1974 Ariz. Sess. Laws, ch. 185, § 2 (2d Reg. Sess.) (codified at A.R.S. §§ 36–501 to –591 (1974)). The Act thoroughly revamped Arizona law on civil commitment of the mentally ill. Daniel W. Shuman, Kenney F. Hegland & David B. Wexler, *Arizona's Mental Health Services Act: An Overview and an Analysis of Proposed Amendments*, 19 Ariz. L. Rev. 313, 313 (1977) [hereinafter *Overview*]; *see In re Pinal Cnty. Mental Health No. MH–201000029*, 225 Ariz. 500, 503, ¶ 13, 240 P.3d 1262, 1265 (App.2010) ("The new law implemented a package of reforms aimed at clarifying and enforcing patients' rights, preventing involuntary psycho-surgeries, and generally protecting patients from abuse and medical neglect." (footnotes omitted)). Among many other significant changes, the revision required pre-petition screening at designated agencies before a court-ordered commitment hearing and encouraged the use of voluntary admission for treatment instead of the involuntary commitment process. *Overview* at 315–25. Although the legislature has amended and revised the Act since its passage, the focus on (1) initial screening of proposed patients before evaluation and treatment, and (2) voluntary, rather than involuntary, treatment has never wavered. The current statutes reflect this focus and demonstrate Arizona's public policy in favor of providing appropriate screening, evaluation, and treatment of individuals who arrive at psychiatric facilities that provide mental health services under the Act, such as PRC.

¶ 18 The Arizona Department of Health Services supervises the delivery of mental health care under the statutory scheme. *See Arnold v. Ariz. Dep't of Health Servs.*, 160 Ariz. 593, 599, 775 P.2d 521, 527 (1989). The Department contracts with RBHAs to deliver mental health care throughout the state. A.R.S. § 36–3401(4), (8) (2009); *see Arnold*, 160 Ariz. at 609–10, 775 P.2d at 537–38 (Arizona's statutory scheme shows the legislature aimed to provide a continuum of effective mental health services in a timely fashion to those in need).

¶ 19 With this general background in mind, we look more specifically to the mental health statutes to determine whether, as a matter of public policy, they provide a basis for a duty of care. Under A.R.S. § 36–518(A) (2009), a person may voluntarily seek mental health treatment. "The agency to which the person applies may accept and admit the person if the medical director of the agency or the admitting officer believes

that the person needs evaluation or will benefit from care and treatment ...." A.R.S. § 36–518(A). Further, under A.R.S. § 36–520(A) (2009), a "responsible individual" can apply for involuntary evaluation and treatment of another. If the applicant "presents" the person who is the subject of the application for involuntary evaluation and treatment to a screening agency, the agency must conduct a pre-petition screening examination. A.R.S. § 36–520(E). A pre-petition screening examination includes "an interview, if possible, with the proposed patient. The purpose of the interview with the proposed patient is to assess the problem, explain the application and, when indicated, attempt to persuade the proposed patient to receive, on a voluntary basis, evaluation or other services." A.R.S. § 36–501(34) (Supp.2010). Thus, whether people are seeking treatment voluntarily or others are seeking treatment for them, Arizona law requires initial screening to determine whether people need further evaluation and treatment, and, if they do, that they receive it.

¶ 20 Similarly, under A.R.S. § 36–526(A) (2009), "an evaluation agency shall perform an examination" of a person "[u]pon presentation of the person for emergency admission." The person may be admitted on an emergency basis without court action if "there is reasonable cause to believe that the person, as a result of a mental disorder, is a danger to self or others, and that during the time necessary to complete the prepetition screening procedures ... the person is likely without immediate hospitalization" to suffer serious harm or seriously harm someone else.[8] A.R.S. § 36–526(A). Additionally, counties, which ordinarily contract for the provision of mental health services, are required to "provide screening or evaluation" "[u]pon a request made by a resident of the county." A.R.S. § 36–545.06 (2009). These statutes demonstrate that if a person seeks mental health services from a mental health facility operating under the Act, the facility must screen and, in some cases, evaluate and treat that person.

¶ 21 These statutes, thus, reflect a public policy that imposes obligations on entities that screen, evaluate, and treat the mentally ill pursuant to the Act. In recognition of this public policy, we hold defendants owed Maudsley a duty of reasonable care based on Arizona statutes that authorize, and in some cases require, mental health screening, evaluation, and treatment of individuals who may be in need of mental health services. *See Arnold,* 160 Ariz. at 609–10, 775 P.2d at 537–38. What is required to satisfy the duty of reasonable care "depend[s] upon the facts of each case," *Stanley v. McCarver,* 208 Ariz. 219, 224, ¶ 16, 92 P.3d 849, 854 (2004), and whether a duty is breached is an issue of fact normally reserved for the jury. *See Gipson,* 214 Ariz. at 143, ¶¶ 9–10, 150 P.3d at 230. Here, defendants may not have breached the duty of care they owed Maudsley, but that will need to be decided by the finder of fact.

¶ 22 Defendants argue the public policy reflected by the mental health statutes does not support a duty and instead demonstrates that "persons receiving outpatient behavioral health services possess the same civil rights as any other person in society, including the right to refuse evaluation or treatment." We acknowledge the statutory scheme "provides a series of procedural safeguards to ensure that court-ordered mental health evaluations are not conducted indiscriminately," *In re MH 2008–000028,* 221 Ariz. 277, 281, ¶ 16, 211 P.3d 1261, 1265 (App.2009), but the issue of whether a patient seeks help voluntarily or involuntarily is a red herring. The issue is duty of care, which is a legal issue to be decided as a matter of law. We hold, as a matter of law, defendants owed Maudsley a duty of reasonable care based on the Arizona statutes that impose obligations on entities licensed to screen, evaluate, and treat the mentally ill.

### III. Traditional Doctor–Patient Relationship

¶ 23 The Estate also argues defendants accepted Maudsley as a patient and thus owed him a duty of care. *Diggs v. Ariz. Cardiologists, Ltd.,* 198 Ariz. 198, 201, ¶ 14, 8

---

**8.** The Petition for Court–Ordered Evaluation filed on Maudsley's behalf did not contend there was reasonable cause to believe he was a danger to self or others.

P.3d 386, 389 (App.2000) ("an express contractual physician-patient relationship clearly gives rise to a duty to the patient"). Meta and ValueOptions disagree—Meta argues it never accepted Maudsley as a patient and ValueOptions asserts Maudsley was simply "voluntary." Whether a duty existed is a question of law, *Gipson*, 214 Ariz. at 143, ¶ 9, 150 P.3d at 230, but "the existence of a duty may depend on preliminary questions that must be determined by a fact finder." *Diggs*, 198 Ariz. at 200, ¶ 11, 8 P.3d at 388. If preliminary facts are in dispute, summary judgment should not be entered.[9] *Id.*

¶ 24 Here, a preliminary question of fact exists as to whether Maudsley's interactions with PRC staff and Dr. Andarsio created a doctor-patient relationship that would give rise to a duty of care. C.J. completed paperwork for Maudsley at PRC and testified, consistent with her contemporaneous written report, Dr. Andarsio told her she had provided information sufficient for intake, and thus she assumed, based on what he had told her and her prior experiences with PRC, Maudsley would be admitted. Additionally, Dr. Andarsio signed CARE 7's "Client Encounter Form" as the "Agency accepting client," and a "decision letter" written by ValueOptions after receiving a request for a grievance investigation stated "[C.J.] stated PRC staff assured her Mr. Maudsley would be *admitted.*" (Emphasis added.) The ValueOptions letter also stated: "The ValueOptions clinical team did not contact PRC to confirm Mr. Maudsley had been *admitted.* Instead, they relied solely on [C.J.] to facilitate Mr. Maudsley['s] *admittance* for care." (Emphasis added.)

¶ 25 Although Meta and ValueOptions employees disputed the existence of a doctor-patient relationship,[10] whether Meta and ValueOptions owed Maudsley a duty of care arising out of such a relationship depended on whether such a relationship factually existed. The superior court was not in a position to determine whether Meta and ValueOptions's involvement with Maudsley at PRC gave rise to a duty of care until the finder of fact determined the preliminary question of whether a doctor-patient relationship existed. Thus, the superior court should not have granted summary judgment.

### IV. Dr. Sbiliris

¶ 26 On appeal, the Estate argues Dr. Sbiliris failed to supervise and ensure proper policies were in place and followed.[11] In response, Dr. Sbiliris argues the Estate did not raise this argument below and no other basis exists for his liability. We disagree; the Estate preserved the issue, albeit barely, through Dr. Potts's affidavit, which stated "Dr. Sbiliris had a supervisor role to ensure that polic[i]es and procedures were in place and followed at the PRC."

¶ 27 Because Dr. Sbiliris had supervisory capacity over ValueOptions psychiatrists, including Dr. Andarsio, a duty based on public policy or a doctor-patient relationship could extend to him. *Cf. Purcell v. Zimbelman*, 18 Ariz.App. 75, 81, 500 P.2d 335, 341 (1972) (hospital could be liable for independent contractor doctor's negligence because "hospital had assumed the duty of supervising the competence of its staff doctors").

### CONCLUSION

¶ 28 For the foregoing reasons, we reverse summary judgment in favor of defendants

9. Although it may be argued *Gipson*'s direction to avoid "fact-specific analysis" in analyzing whether a duty existed, 214 Ariz. at 145, ¶ 21, 150 P.3d at 232, abrogated the rule that a factfinder may need to decide preliminary issues of fact before a court can find whether a duty existed, we do not think *Gipson* went that far. *Gipson* recognized that special relationships can give rise to duties, *id.* at ¶ 19 (listing relationships that can give rise to duty, including landowner-invitee, tavern owner-patron, and special relationships in Restatement (Second) of Torts § 315 (1965)), so whether a special relationship actually existed in a particular instance—such as the case of a doctor-patient relationship created

through admission to a medical facility—may be a factual question a factfinder must decide before a court can analyze duty.

10. Meta and ValueOptions employees repeatedly asserted Maudsley was never admitted and was simply "voluntary." Dr. Andarsio testified Maudsley was not admitted as a patient because he had not "gone through an admission process" and had not "signed a consent for treatment."

11. Any possible liability for Dr. Sbiliris must be premised on supervision because it is undisputed he never had any contact with Maudsley.

and remand for further proceedings consistent with this opinion.

CONCURRING: JOHN C. GEMMILL and PATRICIA A. OROZCO, Judges.