`NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

GROWTH OPPORTUNITIES, INC., *Plaintiff/Appellant*,

*v.*

TENBAR, INC., et al., *Defendants/Appellees*.

No. 1 CA-CV 23-0143
FILED 2-8-2024

Appeal from the Superior Court in Maricopa County
No. CV2019-014852
The Honorable Dewain D. Fox, Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

COUNSEL

Tiffany & Bosco, P.A., Phoenix
By Robert A. Royal, Matthew R. Holt
*Counsel for Plaintiff/Appellant*

Quarles & Brady LLP, Phoenix
By Jimmie W. Pursell, Jr., Daniel J.F. Peabody
*Counsel for Defendants/Appellees*

**MEMORANDUM DECISION**

Chief Judge David B. Gass delivered the decision of the court, in which Presiding Judge Jennifer B. Campbell and Judge Anni Hill Foster joined.

**G A S S**, Chief Judge:

¶1        This appeal arises out of a dispute over a lease agreement for property used as a marijuana cultivation facility. The key issues are whether the landlord consented to an assignment of the lease from named to putative tenant and, relatedly, whether the landlord waived the lease's requirement for landlord consent to such assignment. The putative tenant appeals the superior court's granting of summary judgment for the landlord.

¶2        Though this appeal involves only a few parties, its resolution requires us to journey through six claims and a complicated web of business relationships with other entities and their dealings. At the end of that journey, we vacate summary judgment against the putative tenant and remand for further proceedings on two claims against the landlord: breach of contract and—in the alternative—unjust enrichment. We affirm summary judgment against the putative tenant and for the landlord on the four remaining claims: breach of the duty of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and breach of statutory lease.

## FACTUAL AND PROCEDURAL HISTORY

¶3        When reviewing an order granting summary judgment, this court views the facts in the light most favorable to the non-moving party. *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003).

I.        **The issues here arise from a web of complex business relationships.**

¶4        Tenbar, Inc. is the landlord. Tenbar, Inc.'s president, William Barber, signed the lease for Tenbar. Throughout this decision, we refer to Tenbar, Inc. and Tenbar, Inc.'s president collectively as the landlord.

¶5        Apache Growth Management 31st Ave., LLC is the named tenant on the lease. As explained in the next paragraph, the named tenant entity was dissolved before the issues in the litigation arose.

¶6        GMX Management Group, LLC is the putative tenant. The putative tenant bought the named tenant's assets and assumed the named tenant's interest under the lease shortly before the named tenant entity was dissolved. GMX later assigned any claims arising out of the lease to Growth Opportunities, Inc., not to be confused with Growth Management 31st Ave., LLC, the named tenant identified above. Because Growth Opportunities,

Inc. stands in GMX's shoes in this litigation, we refer to GMX and Growth Opportunities, Inc. collectively as the putative tenant throughout this decision.

¶7 The third set of business entities involved is the dispensary registration certificate holders. The named tenant and the putative tenant could not independently operate the facility because they did not hold a dispensary registration certificate. Instead, the tenant (named or putative) had to operate under a management agreement with a dispensary certificate holder. A company called FWA was the original certificate holder for the named tenant and then for the putative tenant. Later, an affiliate of that original certificate holder entered into a management agreement with the putative tenant to oversee the putative tenant's management of the facility for the original certificate holder. Several years later, the putative tenant began negotiating a management agreement with yet a different certificate-holding dispensary under which the putative tenant could operate the facility, but an agreement was never finalized.

¶8 One other individual merits mention. Michael Forakis was the named tenant's managing partner, and he signed the lease for the named tenant. He also formed GMX, the entity that assumed the named tenant's lease. Forakis also served as GMX's director for a time. He also formed, and was a director of, the original certificate holder (FWA). Later, he formed the original certificate holder's affiliate as another corporate layer to oversee the cultivation at the facility.

## II. The landlord and the named tenant entered into the lease.

¶9 In December 2013, the landlord leased a facility to the named tenant to be used as a marijuana cultivation facility. The lease was for a term from January 2014 through April 2019. Forakis signed the lease on behalf of the named tenant. The named tenant paid a $25,000.00 security deposit under the lease.

¶10 The lease included a sublet clause. The clause read, "The Tenant shall not sublet any part of the premises, nor assign the lease, or any interest therein, without the written consent of the Landlord." The lease also included an "Assignment and Acceptance" term. The assignment clause included blank spaces for the parties to an assignment to fill in with their names and signatures and a space where the landlord could sign to show consent.

## III. The named tenant and the putative tenant entered into the asset purchase agreement.

3

¶11            In October 2015, about two years into the lease, Forakis wrote a letter to the landlord explaining the putative tenant would "manage, pay the bills and collect the receipts for [the named tenant]" going forward. Starting that month, the putative tenant paid the rent from the putative tenant's bank account. Two months later, the named tenant and the putative tenant executed an "Assets Purchase Agreement." Under that purchase agreement, the putative tenant bought the named tenant's assets, including equipment and inventory, and assumed the lease.

¶12            Consistent with the putative tenant assuming the lease, the purchase agreement itemized the named tenant's $25,000.00 security deposit as part of the purchase price. Neither the putative tenant nor the named tenant notified the landlord of the purchase agreement. And neither the landlord, the named tenant, nor the putative tenant executed the assignment term in the lease.

¶13            Yet around the time of the putative tenant's formation, Forakis made a telephone call to the landlord and introduced one of the putative tenant's senior managers. Forakis told the landlord the manager would handle transitioning the lease from the named tenant to the putative tenant. And the putative tenant made rent payments consistent with amounts due under the lease for more than two years, until the putative tenant was forced to leave the facility.

¶14            About six months after the putative tenant and the named tenant executed the purchase agreement, the named tenant was dissolved as a corporate entity, and Forakis resigned from his management position with the putative tenant.

## IV.    The putative tenant and the original certificate holder's affiliate entered into the facility management agreement.

¶15            Under the Arizona Medical Marijuana Act (the Act), the putative tenant could only operate a cultivation facility under the authority of a nonprofit medical marijuana dispensary registered with the Arizona Department of Health Services (the Department). *See* A.R.S. §§ 36-2801.12 (identifying activities in which a nonprofit medical marijuana dispensary may engage), -2804.A, B (requiring registration and certificate); A.A.C. R9-17-305. Here, the original certificate holder was already registered as a nonprofit dispensary. The original certificate holder's certificate authorized operation of its specific dispensary location and one offsite cultivation facility. *See* A.R.S. § 36-2804.B.1(b)(ii) (permitting registration of one

cultivation facility). The facility at issue here was the original certificate holder's designated offsite cultivation facility.

¶16 The putative tenant and the original certificate holder's affiliate executed a management agreement. Under the management agreement, the putative tenant would operate the original certificate holder's cultivation facility on the premises leased by the named tenant, which the putative tenant did for several years.

¶17 The putative tenant also had to "pay all costs and expenses of the managing and operating [the facility], including costs associated with leases and rent, improvement or maintenance of facilities . . ., and any and all tenant improvement costs associated with operations at that location, including any and all tenant improvements required by [the Act and its regulations]." The management agreement also included a schedule of improvements the putative tenant committed to make to the facility with its own funding.

¶18 All the putative tenant's employees were registered dispensary agents under the original certificate holder's operation authority and could enter the facility only if the original certificate holder maintained their agent registration. The original certificate holder, not the putative tenant, had to register the agents. *See* A.A.C. R9-17-311 (dispensary to apply to Department for dispensary agent registry identification cards). Under the Act, all persons who work at a cultivation facility must be registered with the Department and must have an agent card to show their registration status. *See* A.R.S. § 36-2806.E (limiting persons who may access a cultivation facility to "registered nonprofit medical marijuana dispensary agents"); A.A.C. R9-17-310.A.7. Unregistered persons cannot enter the cultivation facility without a registered agent as an escort. *See* A.A.C. R9-17-310.A.8.

## V. The putative tenant alleged the landlord assigned the named tenant's lease to the putative tenant.

¶19 Around August 2017, the City of Phoenix approached the putative tenant about compliance with a Phoenix ordinance regulating marijuana cultivation facilities. Phoenix was reluctant to work with the putative tenant because the putative tenant could not produce a lease with its name on it.

¶20 To address Phoenix's concerns, the putative tenant wrote to the landlord and asked for "an entity change on the current lease." The letter explained "the lease should have been changed when [the named

tenant] was purchased by [the putative tenant] in December of 2015." The change, the letter continued, would "make[] it easier for [the putative tenant] to conduct business with the City of Phoenix." In response, the landlord sent the putative tenant a copy of the lease with the named tenant's name scratched out and replaced with the putative tenant's name (the scratched-out lease). When the putative tenant questioned the landlord about the sufficiency of the scratched-out lease, the landlord responded saying it was all the putative tenant needed for now. The putative tenant understood the landlord's comment as meaning the putative tenant could take the scratched-out lease to the city of Phoenix and use it to hold itself out as the landlord's cultivation-facility tenant.

¶21         Around that time, the landlord telephoned Forakis to ask about the putative tenant's identity. Forakis testified he responded, "I told him they are your tenants—or I told him reach out to your tenants and get some clarification." Even so, the landlord continued to accept rent payments from the putative tenant for about six months. Forakis had been the manager of the putative tenant when it was formed and when it entered the purchase agreement with the named tenant. Yet nothing in the record suggests Forakis told the landlord he had not been affiliated with the putative tenant in the more than a year after he resigned from his management position with the putative tenant. Indeed, the landlord later testified, "[T]he only tenant was [the named tenant] operated by Michael Forakis[, a]nd since he's still there or his partner, . . . that's all we really cared about."

**VI.    The putative tenant's relationship with the original certificate holder's affiliate collapsed, and the putative tenant began a relationship with a different dispensary holding its own dispensary registration certificate.**

¶22         Through 2017, tension grew between the putative tenant and the original certificate holder's affiliate. The affiliate grew concerned about several issues, including the putative tenant allegedly allowing unregistered persons into the facility, which could endanger the certification. In September 2017, the original certificate holder's affiliate sued the putative tenant, alleging breach of contract.

¶23         About two months later, the putative tenant signed a letter of intent with a different dispensary that held its own dispensary registration certificate. The letter of intent's stated purpose was "to establish basic terms to be used in a future licensing agreement," which would include the putative tenant's "lease" of the other dispensary's license to cultivate

marijuana under its certificate, in return for supplying the marijuana so cultivated to the other dispensary. The letter of intent did not prevent the putative tenant or the other dispensary from negotiating with third parties on the same matters and was neither binding nor enforceable. The putative tenant and the other dispensary continued to discuss possible terms and exchanged multiple draft agreements. The other dispensary's owner later testified they had been close to a final agreement. Discussion continued through at least January 2018 but faltered once the other dispensary learned the putative tenant lost access to the facility.

¶24            About a month after signing the letter of intent with the other dispensary, the putative tenant sent a letter to the original certificate holder's affiliate. In that letter, the putative tenant told the original certificate holder's affiliate it had elected to terminate the management agreement as of May 14, 2018, the expiration of the management agreement's initial term. Several months later, on February 20, 2018, the putative tenant sent the original certificate holder's affiliate a letter purporting immediately to terminate the management agreement because of various alleged breaches by the original certificate holder's affiliate. The putative tenant attached a proposed agreement transferring the facility's marijuana inventory from the original certificate holder's affiliate to the other dispensary.

**VII.   The landlord terminated the lease, and the putative tenant was removed from the facility.**

¶25            In January 2018, a director for the original certificate holder drafted a letter for the landlord's signature. That director addressed the letter to the named tenant and to Forakis as a director for the original certificate holder. As noted above, the named tenant no longer existed at that point, but Forakis had been the managing partner who signed the lease for the named tenant and was the manager of the putative tenant when it bought all the named tenant's assets. And he was a director for the original certificate holder.

¶26            The letter said the landlord had approved no lease assignment, the named tenant failed to pay rent due on January 1, 2018, the named tenant failed to obtain lease-required approval for facility alterations, and the landlord was "terminating the lease immediately." The letter then said:

> Furthermore . . ., I have asked [the named tenant], . . . to be
> the tenant on record and no others.

Herein I authorize [the original certificate holder] to contact authorities and evict anyone in contrary to the above arrangements.

Please be advised as the Landlord herein I am leasing the Premises to [the original certificate holder] on the same terms and conditions set forth in the Lease.

¶27 The landlord signed and sent the letter as drafted. Even so, the landlord later testified he did not recall the letter, did not recall reading it, did not write it, and was "not capable of giving . . . an opinion" about who wrote it. The landlord then testified the named tenant—"whatever they called themselves"—did not fail to pay the rent as the letter said and the facility's alterations "had nothing to do with [the landlord]."

¶28 The landlord sent the letter eight days after the putative tenant said it was terminating the management agreement with the original certificate holder's affiliate because of alleged breaches by the affiliate. The record is unclear about when and how the putative tenant learned of the landlord's letter to the then-defunct named tenant. The record, however, shows the original certificate holder revoked all the putative tenant personnel's agent cards before February 26, 2018. On February 26, 2018, the original certificate holder's affiliate went to the facility with private armed security, removed the putative tenant's personnel, and prevented their reentry. The original certificate holder's affiliate allowed only one putative tenant employee to reenter the property, and only under the affiliate's supervision. The employee could not retrieve property, including funds left in the onsite safe because accessing the safe would require giving the combination to the original certificate holder's affiliate.

## VIII. The putative tenant sued the landlord.

¶29 The putative tenant sued the landlord alleging breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and breach of statutory lease. The superior court granted summary judgment for the landlord on all claims.

¶30 We have jurisdiction over the putative tenant's timely appeal under article VI, section 9, Constitution of Arizona, and A.R.S. §§ 12-2101.A.1 and 120.21.A.1.

## ANALYSIS

¶31        The superior court may grant summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Orme Sch. v. Reeves*, 166 Ariz. 301, 305, 309 (1990); Ariz. R. Civ. P. 56(a). This court reviews a grant of summary judgment *de novo* and will affirm "for any reason supported by the record, even if not explicitly considered by the superior court." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329 ¶ 14 (App. 2014); *see also Andrews*, 205 Ariz. at 240 ¶ 12.

## I.        Issues of material fact preclude summary judgment on the putative tenant's breach-of-contract claim.

¶32        The putative tenant challenges the superior court's grant of summary judgment for the landlord on the putative tenant's breach-of-contract claim. The party claiming a breach of contract has the burden to prove the existence of the contract, the breach, and the resulting damages. *ChartOne, Inc. v. Bernini*, 207 Ariz. 162, 170 ¶ 30 (App. 2004).

### A.        The putative tenant established a disputed issue of material fact about whether the landlord agreed to assign the named tenant's interest in the lease to the putative tenant.

¶33        The superior court determined the putative tenant was not the landlord's tenant because "no reasonable juror could conclude that by scratching out '[the named tenant]' and adding '[the putative tenant]', Defendant [the landlord] intended to modify the lease to make [the putative tenant] the tenant." The superior court then concluded the resulting lack of tenancy "preclude[d]" the putative tenant's claim of wrongful eviction and "defeat[ed]" the putative tenant's negligent misrepresentation and promissory estoppel claims.

¶34        Tenants have a right to assign or sublet their leasehold interests freely when not explicitly restricted from doing so by contract or statute. *See Tucson Med. Ctr. v. Zoslow*, 147 Ariz. 612, 614 (App. 1985). Arizona follows the Restatement rule allowing a lease to require a landlord's consent to validate an assignment, but the landlord may not unreasonably withhold such consent. *Id.* (quoting Restatement (Second) of Property § 15.2(2) (1977)). If a tenant fails to obtain the landlord's consent as required by a lease, that failure may give rise to an action for breach, but such action belongs only to the landlord, not the purported assignee. *Riffle v. Robert L. Parker Co.*, 19 Ariz. App. 100, 106 (App. 1973). And landlords have the right to waive a lease's consent requirement. *M. Karam & Sons Mercantile Co. v. Serrano*, 51 Ariz. 397, 407–08 (1938). Whether a landlord has

waived a lease's consent provision is a question of fact. *See Chaney Bldg. Co. v. Sunnyside Sch. Dist. No. 21*, 147 Ariz. 270, 273 (App. 1985) ("[W]aiver may be inferred from conduct and is, therefore, a question of fact . . . .").

¶35 The putative tenant's success on the assignment claim depends on one of two factual findings: the landlord intended the scratched-out lease to be either (1) its "written consent" to an assignment or (2) a waiver of the lease's requirement of written consent. *See M. Karam & Sons Mercantile Co.*, 57 Ariz. at 407–08. The lease required the landlord's written consent for any assignments by the named tenant. The lease also included an "assignment and acceptance" term for the parties to fill out to perfect an assignment. The parties never executed the lease's assignment term, and the landlord did not execute the lease's written consent term.

¶36 A year and a half into the named tenant's tenancy, the putative tenant began paying rent under the lease. Around that time, Forakis told the landlord the lease would be "transition[ed]" from the named tenant to the putative tenant. Two months later, the named tenant and the putative tenant signed the purchase agreement under which the putative tenant bought the named tenant's assets and "assumed" the lease. After signing the purchase agreement, the putative tenant made, and the landlord accepted, rent payments for the facility under the lease for more than two years—through February 2018. The putative tenant also continuously had possession of and operated the facility during that time. Under these facts, the law presumes an assignment of the lease to the putative tenant. *See Indep. Gin Co. v. Parker*, 19 Ariz. App. 413, 415 (1973). Whether the landlord rebuts that presumption is an issue of material fact. *See id.*

¶37 The factfinder must weigh all the evidence, including the scratched-out lease, the landlord's communications with the putative tenant, and the landlord's communications with Forakis. Though the putative tenant continued to ask the landlord for a clearer assignment, that point is just one other piece of evidence for the factfinder to consider in resolving two issues of material fact: (1) was there an assignment of the lease, and (2) did the landlord waive the consent requirement?

¶38 Though the facts create a presumption of an assignment, the landlord may rebut that presumption. *Indep. Gin Co.*, 19 Ariz. App. at 415. And the factfinder must resolve conflicting evidence and draw appropriate inferences from the evidence to determine whether the landlord consented to the assignment or waived the consent requirement. *See Estate of Maudsley v. Meta Servs., Inc.*, 227 Ariz. 430, 434 ¶ 11 (App. 2011) (holding superior

court should not have granted summary judgment when factfinder needed to decide preliminary fact question based on conflicting evidence).

¶39        In short, the factfinder must weigh the significance of the scratched-out lease and the other evidence in the record.

### B.        The putative tenant established alleged damages as issues of material fact.

¶40        The superior court found the putative tenant generally failed to show contract damages with certainty. It also concluded the putative tenant's damages claims were "premised on conjecture and speculation" insufficient to survive summary judgment.

¶41        To prove profits lost from a breach of contract, a plaintiff must "establish[] a reasonably certain factual basis for computation of lost profits." *Rhue v. Dawson*, 173 Ariz. 220, 228–29 (App. 1992) (citation omitted). A plaintiff may establish reasonable certainty by "devis[ing] some reasonable method of computing [its] net loss." *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 184 (App. 1984). But the plaintiff need not establish the calculated amount with the same degree of certainty as the fact of damages itself. *Id.*

¶42        The putative tenant produced evidence it operated at the facility as a cultivation enterprise for over two years and earned a net profit over that time. Based on the putative tenant's history at the facility, it induced the other dispensary to sign a letter of intent to enter a cultivation agreement with the putative tenant. The evidence shows the two companies were close to a final agreement but the discussions stopped once the putative tenant was removed from the facility and separated from the necessary tools and equipment. The putative tenant also produced an expert report showing its projected loss for the remaining lease term based on its historical performance, likely key terms of the expected cultivation agreement with the other dispensary, and marijuana market projections. *Cf. Rhue*, 173 Ariz. at 229 (approving analysis of comparable sales, net income, discounted cash flows, and replacement costs in appraisal to value property for lost-profit claim); *Rancho Pescado*, 140 Ariz. at 186 (noting lack of conclusive evidence of lost-profit claimant's ability to successfully market the product he was prevented from marketing, unlike the putative tenant's evidence here).

¶43        In addition to evidence of lost profits, the record contains evidence the putative tenant lost control of other personal property when the putative tenant was removed from the facility and not permitted to

return. The putative tenant left cultivation equipment in the landlord's facility, along with equipment and other personal property the putative tenant and its employees acquired and left in the facility upon the putative tenant's removal. And the putative tenant came forward with evidence of some of that property's value. The putative tenant and the named tenant valued the equipment then in the facility at $230,000.00 in the purchase agreement. No matter why that equipment and property were in the facility—whether under the management agreement or otherwise—the landlord has not shown it had any right to possess and transfer that equipment and property to another party: its new tenant, the original certificate holder.

¶44        True enough, a factfinder ultimately may find the putative tenant did not meet its burden to prove damages. Even so, the putative tenant brought forward a sufficiently certain factual basis for the computation of its alleged damages to survive summary judgment. The question of the putative tenant's alleged damages, thus, is for the jury.

## II.     Issues of material fact preclude summary judgment on the putative tenant's unjust-enrichment claim.

¶45        The putative tenant challenges the superior court's grant of summary judgment for the landlord on the putative tenant's unjust-enrichment claim. To succeed on a claim of unjust enrichment, a claimant "must show (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy at law." *Span v. Maricopa Cnty. Treasurer*, 246 Ariz. 222, 227 ¶ 15 (App. 2019). When it granted summary judgment on the putative tenant's unjust enrichment claim, the superior court ruled the putative tenant failed to show the landlord was enriched.

> ### A.     Material fact issues preclude summary judgment on whether the landlord was enriched because the landlord took possession and control of the putative tenant's equipment and property and then leased the facility to the new tenant as a fully equipped medical marijuana cultivation facility.

¶46        The putative tenant argues the landlord was unjustly enriched when the putative tenant was removed from the facility and the landlord took possession of the putative tenant's improvements and personal property, including its equipment.

¶47        The putative tenant made extensive improvements to the landlord's facility: replacing and upgrading HVAC and electrical systems, fixing fire escapes, roofing, landscaping, upgrading windows and doors, and upgrading security systems. The putative tenant also added a thousand-square-foot commercial kitchen, including all necessary fixtures and internal infrastructure improvements. The putative tenant made the repairs and improvements so the facility could operate as a medical marijuana cultivation facility. All those improvements remained at the facility after the putative tenant was removed. The putative tenant also left cultivation equipment in the landlord's facility. The putative and the named tenant valued that equipment at about $230,000.00 in the purchase agreement. And the putative tenant and its employees left other equipment and personal property behind upon the putative tenant's forcible removal.

¶48        A jury reasonably could find the landlord was enriched when it took possession from the putative tenant by terminating the lease early and entering into a new lease with the original certificate holder. When the putative tenant was removed from the facility, the landlord had a fully equipped and functional medical marijuana cultivation facility ready to be leased to the original certificate holder for immediate occupation with no pause in operation, rent, or need for improvements.

¶49        The landlord argues the putative tenant's improvements did not enrich the landlord because the putative tenant made them to fulfill "independent obligation[s] under the Management Agreement for the benefit of [the original certificate holder and its affiliate]—not [the landlord] . . . ." The management agreement is to the contrary. In it, the original certificate holder's affiliate acknowledged the putative tenant "*[was] the owner* of all[] office furniture, fixtures and equipment used in the operation of the [certificate holder's affiliate] grow facility including, *without limitation, items located on the premises*" except for items the putative tenant was prohibited from owning under the Act. (Emphases added.) Contrary to the landlord's contention, the management agreement supports the landlord's enrichment because it evidences the putative tenant's ownership of personal property on the premises when the putative tenant was removed from the facility because of the landlord's actions.

¶50        And in entering a new lease with the original certificate holder, the landlord undercut the putative tenant's interests under the management agreement. The record contains no evidence the landlord ever acted to return any of the putative tenant's personal property left in the facility to its possession. Rather, it shows most of that property fell into the possession of the original certificate holder. The landlord, thus, allowed the

original certificate holder to take possession of the very equipment and personal property the original certificate holder's affiliate acknowledged in the management agreement belonged to the putative tenant.

**¶51** The landlord also argues the putative tenant should seek relief for its lost property damages by bringing a breach of contract or conversion claim against the original certificate holder or its affiliate. But any potential claim at law the putative tenant may have against the original certificate holder or its affiliate is not a defense to the putative tenant's equitable unjust enrichment claim against the landlord. *See Loiselle v. Cosas Mgmt. Grp.*, 224 Ariz. 207, 211 ¶ 14 (App. 2010) ("The legal remedy . . . must be against the same person from whom relief in equity is sought.").

**¶52** The landlord took possession and control of the putative tenant's property when it entered into the new lease with the original certificate holder while the putative tenant's property remained at the facility, fully equipping it for marijuana cultivation. In so doing, the landlord asserted its reversionary interest in the facility without providing for the return of the putative tenant's property. At bottom, the putative tenant has come forward with sufficient evidence the landlord took control of the putative tenant's property and secured a gain when the landlord terminated the lease early and executed a new lease with the original certificate holder. In defense, the landlord must justify withholding the putative tenant's property or prove by contrary evidence it was not enriched.

> **B.** **Material fact issues preclude summary judgment on whether the landlord was unjustly enriched by the putative tenant paying rent for February 2018.**

**¶53** The putative tenant argues it "did not receive the full benefits of its rights as a lessee for the rent paid to [the landlord]." But before it was removed from the facility, the putative tenant enjoyed its possession and use consistent with a tenancy under the lease, whether the putative tenant was, or was not, a party to or assignee of the lease. Indeed, the putative tenant earned a net profit over that time. The putative tenant cannot establish it was unjust for the landlord to receive the putative tenant's rent payments under those circumstances. Though true the putative tenant was impoverished by the rent payments through late February 2018, the landlord was justified in receiving those rent payments in exchange for the putative tenant's possession and use of the facility.

¶54          The putative tenant, however, has established an adequate factual basis for its claim for the rent payments attributable to the two and a fraction of days at the end of February 2018 for which the putative tenant paid rent but was excluded from the facility. For those two-plus days, the putative tenant was prevented from possessing or using the facility because the landlord chose to enter a new lease with the original certificate holder and the original certificate holder's affiliate removed the putative tenant from the facility.

> **C.     The putative tenant's unjust enrichment claim fails if the putative tenant ultimately proves it had a valid contract with the landlord.**

¶55          The landlord correctly argues the putative tenant's unjust enrichment claim cannot survive if it has a valid claim at law. *See Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174 (1976) ("[W]here . . . a specific contract . . . governs the relationship of the parties, the doctrine of unjust enrichment has no application."). But as discussed above, factual issues preclude summary judgment on whether the putative tenant has any contract claim under the lease. *See supra* ¶¶ 32–44. That issue must be resolved on remand. If the putative tenant prevails on the assignment issue, it has no claim for unjust enrichment. But if the landlord prevails on the assignment issue, then and only then, the putative tenant may proceed on its claim for unjust enrichment.

¶56          Otherwise, the record shows disputed material facts under all elements required for the putative tenant's unjust enrichment claim. They include the value of the property and upgrades it owned that were left in the facility and the rent it paid attributable to the final days of February 2018 when it did not have possession or use of the facility. If the factfinder on remand does not find a contract between the landlord and the putative tenant, the superior court must evaluate whether the putative tenant is entitled to compensation for the unjust enrichment the landlord received. *See State v. Ariz. Pension Plan.*, 154 Ariz. 56, 58 (1987) (noting unjust enrichment provides for equitable remedy of restitution when the court finds justice and equity require compensation for benefits received). The value of the property transferred, the justifiability of rent paid, and the amount of resulting benefit to the landlord are questions of fact.

¶57          This court, thus, must vacate the grant of summary judgment as to the putative tenant's unjust enrichment claim.

**III. No issues of material fact preclude summary judgment on the putative tenant's claims for the landlord's alleged breach of the covenant of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and breach of statutory lease.**

¶58        We now turn to the putative tenant's remaining claims.

**A. The putative tenant established no issues of material fact to preclude summary judgment for the landlord on the putative tenant's claim for breach of the covenant of good faith and fair dealing.**

¶59        "Arizona law implies a covenant of good faith and fair dealing in every contract." *Keg Rests. Ariz., Inc. v. Jones*, 240 Ariz. 64, 77 ¶ 45 (App. 2016). The covenant imposes on contract parties the duty not to "act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149, 153 (1986). A party can breach the covenant "both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424 ¶ 14 (App. 2002). Arizona has adopted the Restatement rule against a lessor's unreasonable withholding of consent for lease assignment as consistent with Arizona's recognition of the implied covenant of good faith and fair dealing. *See Campbell v. Westdahl*, 148 Ariz. 432, 436–37 (App. 1985) (reasoning); *Zoslow*, 147 Ariz. at 614 (adopting rule) (quoting Restatement (Second) of Property § 15.2(2) (1977)).

¶60        The landlord argues the putative tenant waived the claim for breach of the covenant of good faith and fair dealing it makes on appeal. To begin, the putative tenant abandons an argument it made in its amended complaint. In that complaint, the putative tenant alleged the landlord breached its duty by allowing the original certificate holder to take possession and control of the facility and its contents and executing an "overlapping lease" with the original certificate holder.

¶61        In its opening brief, the putative tenant argues for the first time the landlord breached the covenant of good faith and fair dealing by unreasonably withholding consent to assign the lease to the putative tenant. The putative tenant's new argument is as follows: if the landlord did not agree to assign the lease to the putative tenant when it provided the scratched-out lease, then the landlord unreasonably withheld its consent.

The crux of the new argument is the landlord treated the putative tenant like a tenant for six months after it provided the scratched-out lease.

¶62 The putative tenant presents yet another new argument in its reply brief, suggesting for the first time it can prevail on this claim even if no contractual relationship existed between it and the landlord. The putative tenant argues fact questions preclude summary judgment "because [the putative tenant] did not receive the benefits or reasonable expectations of the lease with [the landlord]." Further, "[i]f [the putative tenant] was not a tenant, then by accepting rent for nearly a year after [the landlord] received knowledge that [the putative tenant] was occupying the space, and withholding consent for the assignment, [the landlord] breached that covenant."

¶63 The putative tenant waived these arguments by not raising them at the superior court. *See BMO Harris Bank N.A. v. Espiau*, 251 Ariz. 588, 593–94 ¶ 25 (App. 2021).

> **B. The putative tenant established no issues of material fact to preclude summary judgment for the landlord on the putative tenant's claim for negligent misrepresentation.**

¶64 To prevail on a claim of negligent misrepresentation the plaintiff must prove five elements:

> (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage.

*KB Home Tucson*, 236 Ariz. at 333 ¶ 30 n.7 (citing *Mur-Ray Mgmt. Corp. v. Founders Title Co.*, 169 Ariz. 417, 422–23 (App. 1991)).

¶65 The putative tenant argues sufficient evidence shows the landlord misrepresented its relationship with the putative tenant because the landlord did the following: (1) accepted rent payments and responded to maintenance requests from the putative tenant, (2) provided the scratched-out lease, and (3) told the putative tenant the scratched-out lease was all the putative tenant needed to deal with Phoenix. The putative tenant argues those statements were misrepresentations because they

conflict with the landlord's argument the putative tenant did not have a leasehold interest in the facility.

¶66        The putative tenant's argument fails as to the landlord's accepting the putative tenant's rent payments and responding to the putative tenant's maintenance requests because those acts cannot reasonably be understood as the landlord making a "representation" as to whether the putative tenant had a leasehold interest in the facility.

¶67        Even if we accept—without deciding—the putative tenant's argument the landlord made misrepresentations when the landlord provided the scratched-out lease and told the putative tenant the scratched-out lease was all the putative tenant needed to deal with Phoenix, the putative tenant cannot show it relied on that information. The putative tenant was paying rent and managing the facility before receiving the scratched-out lease and continued to do so after. The putative tenant argues its "continuing to hold tenancy" at the facility shows it relied on the landlord's alleged misrepresentations, but the putative tenant possessed the facility and paid rent all along. The putative tenant points to no evidence it changed its behavior to suggest it relied on the landlord's alleged misrepresentations, and we find none in the record.

¶68        As a result, we affirm the grant of summary judgment on this claim.

> **C.     The putative tenant established no issues of material fact to preclude summary judgment for the landlord on the putative tenant's claim for promissory estoppel.**

¶69        The putative tenant argues the superior court erred when it granted summary judgment on the putative tenant's claim of promissory estoppel. To prove promissory estoppel, the putative tenant must show the landlord "made a promise and should have reasonably foreseen that [the putative tenant] would rely on that promise" and that the putative tenant did rely on that promise to its detriment. *See Higginbottom v. State*, 203 Ariz. 139, 144 ¶ 18 (App. 2002). The putative tenant argues that when the landlord provided the scratched-out lease, the landlord promised "the . . . lease had been validly assigned to [the putative tenant]" and the landlord should have known the putative tenant would rely on this promise.

¶70        Promissory estoppel, as a cause of action for damages, "operates not in regard to a past or presently existing state of facts, but rather to a situation which one party promises will be true in the future."

*Tiffany Inc. v. W.M.K. Transit Mix, Inc.*, 16 Ariz. App. 415, 419 (1972). The putative tenant's argument fails because the landlord made no promise when it provided the scratched-out lease. The name-change on the lease either served as an assignment of the lease or it did not. It could not be a promise of a future assignment.

¶71 The putative tenant's claim for promissory estoppel, thus, fails. We affirm the grant of summary judgment on this claim.

> **D.** **The putative tenant established no issues of material fact to preclude summary judgment for the landlord on the putative tenant's claim for breach of statutory lease.**

¶72 The putative tenant argues the superior court erred by granting summary judgment because the landlord breached a statutory month-to-month tenancy by not providing the putative tenant ten days' notice of its termination. *See* A.R.S. § 33-341.B (notice requirement for month-to-month lease). The superior court ruled this claim failed as a matter of law because a lease for the facility was in place with the named tenant, not the putative tenant. The superior court then concluded the named tenant, not the putative tenant, was the only tenant who could hold a statutory, month-to-month lease under subsection 33-341.B.

¶73 The putative tenant argues it had, even with no assignment of the lease, "statutory lease rights as a month-to-month tenant under A.R.S. § 33-341" because it paid rent, the landlord accepted that rent, and the putative tenant occupied the facility. True, a tenant's holding over after expiration of a lease will cause a month-to-month tenancy governed by the original lease terms. A.R.S. § 33-342 (creating month-to-month tenancy); *Pima Cnty. v. Testin*, 173 Ariz. 117, 119 (App. 1992) (holding original lease terms govern tenancy). But Subsection 33-341.E forecloses the putative tenant's argument by precluding tenancies at sufferance or will when a putative tenant is in possession of property against the will of a landlord. Even so, the putative tenant relies on A.R.S. § 33-342 and *Mestro v. Pasionek*, 1 CA-CV 22-0218, 2022 WL 17258801 (Ariz. App. Nov. 29, 2022) (mem. decision) to show the landlord created a tenancy when it accepted rent from the putative tenant. That reliance is misplaced. Section 33-342, consistent with A.R.S. § 33-341.E, applies only to holdover tenants, and *Mestro* similarly involves litigation around a holdover tenancy. *See* 1 CA-CV 22-0218 at *2 ¶ 12.

¶74 In short, regardless of the status of the original lease at the time of the putative tenant's removal, Arizona law does not provide for the

creation of a landlord-tenant relationship by implication against the will of the landlord. So, absent an original tenancy after which the putative tenant could hold over, the putative tenant's payment of rent, the landlord's acceptance of the rent, and the putative tenant's occupation of the facility are irrelevant. That evidence cannot alone establish the existence of a holdover month-to-month tenancy subject to the notice requirement of subsection 33-341.B. *See* A.R.S. § 33-342 (providing for month-to-month holdover tenancies).

¶75 The putative tenant's "breach of statutory lease" claim, thus, fails as a matter of law. We affirm the grant of summary judgment on this claim.

## ATTORNEY FEES AND COSTS

¶76 Both the putative tenant and the landlord request attorney fees under A.R.S. § 12-341.01. In our discretion, we decline to award attorney fees because of the preliminary nature of this case on remand. On remand, the superior court may consider any request for attorney fees, including those incurred in this appeal, when this litigation concludes. *See Eans-Snoderly v. Snoderly*, 249 Ariz. 552, 559 ¶ 27 (App. 2020). We award the putative tenant its taxable costs on appeal as the prevailing party on compliance with ARCAP 21.

## CONCLUSION

¶77 We affirm the superior court's grant of summary judgment against the putative tenant on its claims of breach of the covenant of good faith and fair dealing, negligent misrepresentation, promissory estoppel, and breach of statutory lease. We vacate the superior court's grant of summary judgment against the putative tenant on its claims of breach of contract and unjust enrichment and remand for further proceedings consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: AA